UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Rhode Island Truck Center, LLC, )<br>    Plaintiff, )<br> )<br>    v. )<br> )<br>Daimler Trucks North America, LLC, )<br>    Defendant. )<br> ) | C.A. No. 23-cv-001-MRD-PAS |

MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

In 2016, Rhode Island Truck Center ("RITC") and Daimler Trucks North America ("DTNA" or Daimler) entered into a Dealer Agreement (Agreement) that allowed RITC to open a Freightliner franchise in a particular Area of Responsibility ("AOR"). The Agreement allowed Daimler to authorize additional franchises within RITC's AOR as it deemed warranted, and Daimler did just that. In 2019, Daimler authorized the opening of Advantage Truck Group Raynham ("ATGR") in RITC's AOR, and while they started by only selling Western Star trucks, they were soon a full throttle authorized Freightliner dealer.

RITC sued Daimler for breach of contract and breach of the implied covenant of good faith and dealing, and Daimler has moved for summary judgment. In deciding whether there is a genuine issue of material fact, the Court focuses on a clause in the Agreement that provides, in part, that Daimler, "in the exercise of its sole discretion, determines that such new dealers are warranted." For reasons explored below, the

Court finds the aforementioned clause unambiguous, and that Daimler had sole discretion to authorize a new dealer within RITC's AOR. Therefore, Daimler's Motion for Summary Judgment (ECF No. 38) is GRANTED.

## I. BACKGROUND

The facts of this case began in 2016 when Daimler and RITC entered into an Agreement that allowed RITC to sell Freightliner Trucks in a defined AOR.[1] Def.'s SUF 3-4, ECF No. 39; Pl.'s SDF 3-4, ECF No. 61.[2] RITC's AOR covered five counties in Rhode Island as well as Bristol County in Massachusetts. Def.'s SUF 7; Pl.'s SDF 7. The "Appointment" clause of the Agreement states that Daimler grants to RITC "[t]he nonexclusive right to sell Freightliner Trucks Products in [RITC's] [AOR]." Def.'s SUF 8; Def.'s SUF Ex. 2 at 6 (Sec. I. D.). The Appointment clause goes on to explain "that additional authorized Freightliner Trucks dealers may be appointed in or near the [AOR] of [RITC] when [Daimler], in the exercise of its sole discretion, determines that such new dealers are warranted."[3] *Id.*

Over the first five years of the Agreement (2016-2021), RITC worked to try to expand its operation by both upgrading its East Providence facility and seeking out larger facilities in other locations. Pl.'s SUF 6-8, ECF No. 60; Def.'s SDF 6-8, ECF No. 63. These investments were made at the same time RITC was seeking permission

---

[1] A second version of the Dealer Agreement was executed in 2019, but the relevant provisions are identical to the earlier agreement. Def's SUF 4; Pl.'s Resp. to Mot. for Summary Judgment, ECF No. 51 at 4 n.2. Both parties rely on the 2019 version so the Court will do the same.

[2] Def.'s SUF shows redactions while ECF No. 45 is the unredacted version.

[3] The Court notes that this provision was included in both the 2016 and 2019 versions of the Agreement.

2

from Daimler to add Western Star – another Daimler truck product – to its existing Freightliner dealership.  Pl.'s SUF 19; Def.'s SDF 19.  Daimler claims it denied the application in 2017 because RITC's facility was not large enough.  Pl.s SUF Ex.1 at 65 (Dep. Tr. of S. Bachrodt at 119:1-120:7).  According to RITC, the application was denied because Daimler wanted RITC to move "further west."  Pl.'s SUF 8-9.  Daimler cited other concerns about the facility's configuration, ingress/egress limitations, and lack of adequate space for truck and customer parking.  Def.'s SDF 9.  RITC ended up relocating to a larger facility in East Providence, a move Daimler approved.  Pl.'s SUF 10; Def.'s SDF 10.  This location, which cost millions and quadrupled RITC's operating capacity, opened in 2021.  Pl.'s SUF 11-12; Def.'s SDF 11-12.

While RITC was seeking to expand its business operation, senior Daimler officials were discussing business options for their New England/Northeast dealers.  Pl.'s SUF 22; Def.'s SDF 22.   RITC suggests that senior leadership at Daimler sought to consolidate their dealer network and were in discussions with Advantage Truck Group ("ATG") to be a part of that strategy.  Pl.'s SUF 17, 24.  Daimler denies any strategy to secure the market for ATG, and counters that it was simply evaluating potential business transactions in the ordinary course.  Def.'s SDF 26.  In April 2018, Daimler provided ATG with a "commitment for a full-service Freightliner and Western Star dealership in Raynham, MA."  Pl.'s SUF 50 (quoting Pl.'s SUF Ex. 14 at 2); Def.'s SDF 50.  The ATGR dealership officially opened in June 2021.  Def.'s SUF 9; Pl.'s SUF 13; Pl.'s SDF 9; Def.'s SDF 13.

3

Daimler never notified RITC of its ongoing negotiations, or eventual deal, with ATG, and RITC was not aware that a new Freightliner dealer was authorized in its AOR until after ATGR opened in 2021. Pl.'s SUF 52; Def.'s SDF 52. RITC was told, in 2019, that ATG would only open a new Western Star Dealership in Raynham, Massachusetts. Pl.'s SUF 63; Def.'s SDF 63.[4]

In Daimler's motion for summary judgment on RITC's claims for breach of the contract and breach of the covenant of good faith and fair dealing, Daimler argues the Agreement is unambiguous and that Daimler was expressly, and in its sole discretion, authorized to appoint ATGR as a dealer within RITC's AOR. Mem. In Supp. of Mot. for Summ. J. at 10, ECF No. 44. It also argues that RITC's breach of contract claim must fail because there are no recoverable damages. *Id.* at 15.

## II. APPLICABLE STANDARD

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[4] This fact is disputed to the extent it suggests a certain party initiated the call, but it is undisputed that Bachrodt was informed about ATG opening a new Western Star Dealership on this call.

4

*Id.* at 56(c)(1). The moving party bears the burden of informing the Court for the basis of its motion and identifying the portions of the record which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Dep't of Just.*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986)). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which it has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322-25). "Neither conclusory allegations nor improbable inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (citation modified) (quoting *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996)). "The test is whether, as to each essential element, there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *DeNovellis*, 124 F.3d at 306 (quoting *Anderson*, 477 U.S. at 249-50).

"A federal court sitting in diversity jurisdiction must borrow the substantive law of the forum state." *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1991) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). "Where, however, the parties have agreed about what law governs, a federal court sitting in diversity is

free, if it chooses, to forgo independent analysis and accept the parties' agreement." *Id.* (citing *Moores v. Greenberg*, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987)); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 31 (1st Cir. 1984). The Agreement indicates that "[t]his Agreement has been made in and shall be construed and interpreted according to the laws of the state in which [RITC] is located," so the parties rely on Rhode Island law. Def.'s SUF Ex. 2 at 38.

Under Rhode Island law, "it is well settled that… '[a]n ambiguity in a contract cannot be resolved on summary judgment.'" *Nat'l Refrigeration, Inc. v. Standen Contracting Co.*, 942 A.2d 968, 972 (R.I. 2008) (quoting *Rubery v. The Downing Corp.*, 760 A.2d 945, 947 (R.I. 2000)). "Whether a contract's terms are ambiguous is a question of law." *Id.* at 971 (citing *Dubis v. E. Greenwich Fire District*, 754 A.2d 98, 100 (R.I. 2000)). "[A] contract may be deemed ambiguous only if 'it is reasonably and clearly susceptible of more than one interpretation.'" *Id.* at 972 (quoting *Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I. 1996)). The Rhode Island Supreme Court has "long held that '[i]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." *Id.* (quoting *Clark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill*, 652 A.2d 440, 443 (R.I. 1994)). And finally, Rhode Island adheres to "the rule of interpretation," meaning the document "must be viewed in its entirety and its language given its plain and ordinary meaning." *Id.* (quoting *Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc.*, 852 A.2d 535, 542 (R.I. 2004)).

## III.   DISCUSSION

For the Court to consider granting summary judgment, it must find that there is no ambiguity in the Appointment Clause of the Agreement, Section I.D (set forth below), meaning the provision is clear and unambiguous.  *Id.* at 972.  This inquiry leads the Court to first examine the plain and ordinary meaning of Clause and the Agreement as a whole.  *Id.*  Then, the Court will move on to discuss RITC's argument about whether Daimler, in fact, determined that a new dealer in RITC's AOR was warranted.  See *Papudesu v. Med. Malpractice Joint Underwriting Ass'n of R.I.*, 18 A.3d 495, 498-99 (R.I. 2011) (explaining that when there is no ambiguity in the Agreement language, "[the] judicial role becomes quite straightforward: the plain language of the policy is to be applied").  As explained below, the Court finds the clause "in the exercise of [Daimler's] sole discretion" is dispositive because it allowed Daimler, and Daimler only, to decide whether a new dealer in RITC's AOR was warranted.

### A.   The Agreement term is unambiguous

The parties agree that the Appointment Clause is clear and unambiguous, yet they set forth different interpretations of the Clause.  The Appointment Clause states the following:

> The nonexclusive right to sell Freightliner Trucks Products in DEALER's [AOR], as described in DEALER's [AOR] Addendum. Dealer understands COMPANY may alter DEALER's [AOR] at any time by providing a revised [AOR] Addendum to Dealer. DEALER and COMPANY understand and agree that additional authorized Freightliner Trucks dealers may be appointed in or near the [AOR] of DEALER when COMPANY, in the exercise of its sole discretion,

7

determines that such new dealers are warranted. Def.'s SUF Ex. 2 at 6.  The parties direct the Court's focus to the meaning of the clause "in the exercise of its sole discretion" and the term "warranted."  Daimler argues that the plain meaning of these terms is fatal to RITC's claims because the Clause "does not impose on Daimler any obligation to put forward a 'basis' for the exercise of its sole discretion, nor does it require Daimler to provide RITC with a 'justification' for its decision." Def.'s Mem. in Supp. of Summ. J. at 10.  RITC responds by arguing that "[t]he language of the Dealer Agreement expressly limits Daimler's discretion by requiring Daimler to make a determination that appointing a new dealer in RITC's area of responsibility is 'warranted.'" Pl.'s Obj. to Def.'s Mot. for Summ. J. at 19-20, ECF No. 59.  It suggests "[n]o such determination was made." *Id.* at 20.

Adhering to the rule of interpretation, *see Garden City Treatment Ctr., Inc.*, 852 A.2d at 542, and applying the plain and ordinary meaning of the terms, the Court finds that no ambiguity exists in this provision.  According to merriam-webster.com, "warranted" means "ground" or "justification."  *Warranted*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/warranted (last visited July 17, 2025). And "discretion" is defined as "individual choice or judgment."  *Discretion*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/discretion (last visited July 17, 2025).  When these plain and ordinary meanings are applied to Section I. D. of the Agreement, no ambiguity exists.  The provision allowed Daimler to appoint a new Freightliner dealer in RITC's AOR when Daimler, in its individual choice or judgment, decided there were grounds for a new dealer.

8

The Rhode Island Supreme Court has stated that when there is "no ambiguity in the policy language, our judicial role becomes quite straightforward: the plain language of the policy is to be applied." *Papudesu*, 18 A.3d at 498. Since there is no ambiguity in the Agreement language, the Court will move on to determine whether there are any disputed facts that will preclude summary judgment at this time which leads to applying the plain language of the Agreement to the undisputed facts presented by the parties.

B. **Applying the unambiguous Agreement provision**

RITC argues that Daimler violated the policy by not *actually* deciding that a new Freightliner dealer was "warranted" in RITC's AOR. *See generally* Pl.'s Obj. to Def.'s Mot. for Summ. J.at 26-36 (emphasis added). First, RITC suggests that the absence of a market study is "telling" because Daimler witnesses said local market data should be considered when determining whether a new dealer is warranted. *Id.* at 26-27. They refer to testimony on what local market data should be considered in determining whether a new dealer is "warranted" and what local market data was considered by Daimler before appointing ATGR. *See e.g., id.* at 27 (describing how Daimler officials "did not recall that any sort of market study was done before Daimler decided to appoint ATGR.").

RITC focuses on the testimony of William Hoelscher – Daimler's business development manager in the distribution network development group – who discussed in his deposition what Daimler typically considers when deciding if a new

9

dealership is warranted, and what was considered here. *Id.* at 27-29. Hoelscher testified to the following:

> Q. So let's say [your boss] came to you and said Mr. Hoelscher, I'd like to have you determine for me whether there are any areas in your region that we might consider appointing a new dealer because there's a customer support concern. How would you go about answering that question for him.
>
> A. We would study our existing dealer map. We would look at McKay data typically to determine what kind of demand for service there is in the area. We would look at the existing dealers and how they're covering it by number of base, techs, locations, and form an opinion.

Pl.'s SDF Ex. 15 at 97:16 – 98:5. When specifically asked if there were company policies to determine when to put a new dealer in an AOR, Hoelscher responded "[n]o." *Id.* at 102:10-13. Then when asked whether any of the previously mentioned factors were considered, Hoelscher responded with the following exchange:

> A. The biggest consideration was existing dealers there, Boston and RITC, and neither one was a performing dealer. Second is field input as to the need, the demand, and that was it.
>
> . . .
>
> Q. And the dealer performance, and it's the performance of Boston Freightliner and [RITC]?
>
> A. Yes.
>
> Q. And what did the consideration of that performance involve?
>
> A. All of the things we've talked about all along about specific - - or particularly Rhode Island where, you know, not making any progress on training, continued turnover.
>
> Q. And did you do that analysis? Did someone else with you? How did that work?

10

> A. We live it. We know that. We see it regularly from the day they start until the day that we made a different decision.

*Id.* at 106:19-23, 107:5-22. RITC suggests this demonstrates that "there is a genuine dispute of material fact as to whether Daimler made a determination that ATGR's appointment was 'warranted' and thus breached the Dealer Agreement." Pl.'s Obj. to Def.'s Mot. for Summ. J. at 30.

This Court disagrees. The plain and ordinary language of the Appointment Clause makes it clear that Daimler, and Daimler alone, gets to decide whether appointment of a new dealer is warranted. In *Hord Corp. v. Polymer Research Corp. of America*, this Court granted summary judgment on a breach of contract claim after finding no ambiguity in a contract provision that let a company terminate an agreement and demand a refund if the products were not suitable for company "at [company's] sole discretion." *Hord Corp. v. Polymer Rsch. Corp. of Am.*, 275 F. Supp. 2d 229, 233, 235 (D.R.I. Aug. 7, 2003). The Court reasoned that "[t]he Agreement allow[ed] plaintiff – in its sole discretion – to exercise that option if the newly-colored rhinestones [were] not readily interchangeable with plaintiff's existing stock." *Id.* at 235. And in *Papudesu*, the Rhode Island Supreme Court found no ambiguity in an insurance contract that allowed an insurance company to settle "any claim or suit as it deem[ed] expedient." 18 A.3d at 496, 499. In granting summary judgment, that Court found the "as it deems expedient" clause in the insurance contract "to be straightforward and readily understandable." *Id.* at 498. It added that "[a]lthough that language clearly gives a great deal of discretion to the insurer, that is precisely what the insurance contract provided for." *Id.* at 498-99. That court "decline[d] to

11

read nonexistent terms or limitations into a contract." *Id.* at 499 (citing *Pearson v. Pearson*, 11 A.3d 103, 109 (R.I. 2011)).

These cases support the Court's decision in the instant case that the Agreement provision allowed Daimler, and Daimler only, to decide if appointment of a new dealer in RITC's AOR was warranted. Like the insurance contract in *Papudesu* "vest[ed] full discretion in the insurer with respect to the issue of settlement," the Agreement provision, here, vested full discretion in Daimler for the issue of appointment of a new Freightliner dealer. 18 A.3d at 498.

RITC's argument that "[s]ummary judgment is especially improper because the evidence supports a compelling alternative explanation – that Daimler's appointment of ATGR was driven by its decision to secure the market for ATG as part of Daimler's strategy to consolidate its dealer network" – misses the mark. Pl.'s Obj. to Def.'s Mot. for Summ. J. at 30. The clear and unambiguous Agreement provision gave Daimler, in its sole discretion, the decision to determine whether a new dealer in RITC's AOR was warranted. Whether motivated by dealer performance issues or a companywide dealer network consolidation strategy, Daimler's decision that a new Freightliner dealer was "warranted" was authorized under the Dealer Agreement. The Court is reluctant to inject itself into Daimler's business decision-making process, especially when doing so would be contrary to the plain language of the Agreement.

The Court concludes that no reasonable jury could find that the Appointment Clause is ambiguous or that Daimler did not have sole discretion to determine if a

new Freightliner dealer was warranted in RITC's AOR. *See DeNovellis*, 124 F.3d at 306. Daimler is entitled to judgment as a matter of law because the language in the Clause is plain and unambiguous and does not present a genuine dispute of a material fact. Fed. R. Civ. P. 56(a). Summary judgment is granted on RITC's claim for breach of contract claim.

### C. Breach of implied covenant of good faith and fair dealing

The next question for the Court to decide, now that it has determined that the contract language is clear and unambiguous, is whether there is any genuine dispute of material fact on RITC's claim for breach of the implied covenant of good faith and fair dealing, and if not, whether Daimler is entitled to summary judgment. "Rhode Island has adopted the covenant in order to ensure that contractual objectives are achieved." *Hord Corp.*, 275 F. Supp. at 237 (citing *Fleet Nat'l Bnk v. Liuzzo*, 766 F. Supp. 61, 67 (D.R.I. 1991)). "The covenant of good faith is regarded as a counterpromise that the promisee will act in a manner consistent with the purposes of the contract." *Id.* (quoting *Ross-Simons of Warwick, Inc. v. Baccarat*, 66 F. Supp. 2d 317, 330 (D.R.I. 1999)).

The purpose of the Agreement is expressly indicated in the "introduction" section. It states the following:

> [DAIMLER] has established a nationwide network of authorized Freightliner Truck Dealers to sell and service the Products that are manufactured and distributed by [DAIMLER]. Dealers have been selected by [DAIMLER] based on their experience and commitment that they will sell and service Freightliner Products in a manner that maximizes sales and customer satisfaction. By entering into this Agreement, [RITC] represents that the Owner(s) identified in the Agreement have the experience, capital, and facilities necessary to

13

> ensure that [RITC] meets its commitments under this Agreement and operates a best-in-class truck dealership.
>
> The purpose of this Agreement is to appoint [RITC] as an authorized Freightliner Trucks Dealer and to set forth the rights and obligations of [DAIMLER] and [RITC].

Def.'s SUF Ex. 2 at 5. The Introduction Clause makes clear that the purpose of the Agreement – or the contractual objectives – was for RITC to operate a successful Freightliner dealership, meaning sales and customer satisfaction were maximized. The Agreement makes repeated references to RITC's "nonexclusive rights." For example, "[t]he nonexclusive right to purchase by [RITC] for resale the Freightliner Trucks Products as defined herein," and "[t]he nonexclusive right to sell Freightliner Trucks Products in [RITC]'S [AOR]." *Id.* at 5-6.

In *Ide Farm & Stable Inc. v. Cardi*, the Rhode Island Supreme Court looked to the objectives of contract to determine that a defendant was not in violation of the covenant of good faith and fair dealing. *Ide Farm & Stable Inc. v. Cardi*, 297 A.2d 643, 644-45 (R.I. 1972). That case involved a contract to purchase property. *Id.* at 644. The purchaser, relying on an "escape hatch" in the contract, backed out of the contract after being unable to secure a mortgage. *Id.* at 643-45. Finding that the defendant did not breach of the covenant of good faith and fair dealing, "the Court emphasized that the defendant would not have entered into the agreement but for this escape hatch." *Id.* at 645.

The Rhode Island Supreme Court has said "[a] party's actions, however, do not violate the covenant of good faith and fair dealing when they were contemplated by the parties at the time of contract formation." *Hord Corp.*, 275 F. Supp. 2d at 238

14

(citing *Psaty & Fuhrman, Inc. v. Hous. Auth. of City of Providence,* 68 A.2d 32, 35 (R.I. 1949)). "An unambiguous contractual clause, agreed upon by both parties, cannot be rendered meaningless, because one party does not like its strict application." *Id.* (citing *Psaty*, 68 A.2d at 36).

The same reasoning can be applied here. The contract's unambiguous language establishes that the parties contemplated that Daimler might appoint a new dealer in RITC's AOR. In fact, as already discussed, the decision to appoint a new dealer in RITC's AOR was unambiguously and exclusively Daimler's to make. Also, the repeated use of "nonexclusive" throughout the Agreement reaffirms Daimler's commitment to retaining the exclusive decision on whether the appointment of a new dealer in RITC's AOR was "warranted." *See generally* Def.'s SUF Ex. 2. It also demonstrates how this Agreement was never intended to give RITC exclusive rights or privileges in the AOR. It merely authorized RITC as a Freightliner dealer, and the opening of ATGR does not change that objective.

There is no genuine dispute of material fact regarding the explicit purpose or objective of the Dealer Agreement. Here, the purpose or objectives of the Agreement were not disturbed by Daimler's decision to appoint ATGR within RITC's AOR. No reasonable factfinder could dispute that "[Daimler] acted within the confines of the parties' contractual objectives, and thus by definition in good faith, [Daimler] did not violate the implied covenant of good faith and fair dealing." *Hord Corp.*, 275 F. Supp. 2d at 238; *see DeNovellis*, 124 F.3d at 306. Daimler is entitled to judgment as a

matter of law and summary judgment is granted on RITC's claim for breach of the implied covenant of good faith and fair dealing.

## IV. CONCLUSION

Daimler's Motion for Summary Judgment on RITC's breach of contract and breach of the implied covenant of good faith and fair dealing claims is GRANTED. Final judgment shall enter in favor of Daimler.

IT IS SO ORDERED.

_____
Melissa R. DuBose
United States District Judge

7/17/2025